## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANTHONY GERVASIO, RICHARD BONGIOVANNI, MICHAEL DINSE, JAMES CLOUD and CHRISTOPHER CARMANY Individually and on Behalf of All Other Persons Similarly Situated, | |
| Plaintiffs, | Civil Action No. 3:17-cv-0025(PSG)(DEA) |
| v. | |
| WAWA INC., | |
| Defendant. | |

## DEFENDANT WAWA, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION

### <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION ............................................................................... 1

II.    PLAINTIFFS AND AGMS ARE NOT SIMILARLY SITUATED ................................. 1

    A.    Plaintiffs Premise Their Motion Primarily On Their Misrepresentation Of Wawa's FRCP 30(b)(6) Testimony ..................... 1

        1.    Plaintiffs Misrepresent Testimony Regarding Job Duties ........................ 2

        2.    Plaintiffs Misrepresent Testimony Regarding Training ........................... 4

        3.    Plaintiffs Misrepresent Testimony Regarding Policies............................. 5

    B.    Plaintiffs Uniformly Disclaim The Job Description That Is A Key Premise For Their Motion............................................................ 7

    C.    Plaintiffs Know Nothing About The Duties Of Other AGMs .............................. 9

    D.    Plaintiffs' Experiences Were Different Even From One Another ...................... 11

        1.    Plaintiffs Received Varying Training ..................................................... 11

        2.    Plaintiffs' Day-to-Day Duties Varied ................................................... 14

    E.    Plaintiffs Are Not Representative of Other AGMS ........................................... 16

        1.    Several Plaintiffs Were Terminated for Poor Performance .................... 16

        2.    Other AGMs Received Varying Training................................................. 17

        3.    Other AGMs Focused On Management In Varying Ways..................... 18

        4.    AGMs' Duties Vary Based on A Number of Factors, Including GM Preferences, Size and Location of Store, Associate Experience Level, Among Other Things ................................................................. 20

III.    ARGUMENT ........................................................................................... 23

    A.    The First-Stage Certification Requirement, While More Lenient Than the Second-Stage, Still Requires Adequate Evidence That The Representative Plaintiffs Are "Similarly Situated" To the Individuals To Whom They Seek To Send Notice.............................................................. 23

    B.    The Court Should Consider The Actual Job Duties Performed By the Plaintiffs And Other AGMs And, If Sufficient Variation Is Shown, Deny Conditional Certification .................................................................. 27

    C.    Conditional Certification Should Be Denied Because Plaintiffs Have Not Shown That They Are Similarly Situated To Hundreds Of Other AGMs They Seek To Represent .................................................................. 30

        1.    Plaintiffs Point To No Policies Causing Common Alleged Misclassification, Including The Job Description and Training That They Claim Have No Bearing On Their Jobs........................................... 30

# <u>TABLE OF CONTENTS</u>

**Page**

2.  The Overwhelming Evidence, Including Plaintiffs' Own
    Testimony, Shows AGMs Are Not Similarly Situated ............................ 35

IV.  NOTICE, IF ANY, SHOULD BE LIMITED TO LOCATIONS WHERE
     PLAINTIFFS WORKED ................................................................................ 37

V.   ANY NOTICE ALLOWED SHOULD BE FAIR AND ACCURATE ........................ 38

VI.  CONCLUSION ............................................................................................ 39

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aboud v. City of Wildwood*,
No. 12-7195, 2013 WL 2156248 (D.N.J. May 17, 2013)......................................................39

*Adeel Tahir, et al. v. Avis Budget Group, Inc.*,
No. 09-3495, 2011 WL 1327861 (D.N.J. Apr. 6, 2011)...................................................33, 37

*Ahmed, et al. v. TJ Maxx Corp. et al.*,
103 F. Supp. 3d 343, 356 (E.D.N.Y. 2015) ............................................................................34

*Atis v. Freedom Mortg. Corp.*,
No. 15-3424, 2016 WL 7440465 (D.N.J. Dec. 27, 2016).......................................................38

*Babin v. Stantec, Inc.*,
No. 09-1160, 2012 WL 2010 ..................................................................................................26

*Bailey v. Youth Vills, Inc.*,
No. 07-1089, 2008 WL 2987201 (W.D. Tenn. July 30, 2008)................................................39

*Bamgbose v. Delta-T Grp. Inc.*,
684 F. Supp. 2d 660 ................................................................................................................31

*Boyington v. Percheron Field Servs., LLC*,
No. 14-90, 2015 WL 3756330 (W.D. Pa. June 16, 2015) ......................................................39

*Bramble v. Wal-Mart Stores, Inc.*,
No. 09-4932, 2011 WL 1389510 (E.D. Pa. 2011) ......................................................... *passim*

*Brown v. Barnes & Noble, Inc.*,
252 F. Supp. 3d 255, 263 (S.D.N.Y. 2017)......................................................................32, 35

*Costello v. Kohl's Ill. Inc.*,
No. 13-1359, 2014 WL 4377931 (S.D.N.Y. Sep. 4, 2014)....................................................31

*Dunkel v. Warrior Energy Servs., Inc.*,
304 F.R.D. 193 (W.D. Pa. 2014) ............................................................................................38

*Essex v. Children's Place, Inc.*,
No. 15-5621, 2016 WL 4435675 (D.N.J. Aug. 16, 2017) .....................................................30

*Evancho v. Sanofi-Aventis U.S., Inc.*,
No. 07-2266, 2007 WL 4546100 (D.N.J. Dec. 19, 2007)................................................ *passim*

## TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Goldstein v. Children's Hosp. of Phila.*,
No. 10-01190, 2012 WL 5250385 (E.D. Pa. Oct. 24, 2012) ....................................................35

*Guillen v. Marshalls of MA, Inc.*,
750 F. Supp. 2d 469 (S.D.N.Y. 2010).....................................................................................32

*Harriel v. Wal-Mart Stores*,
No. 11-2510, 2012 WL 2878078 (D.N.J. July 13, 2012) .............................................. *passim*

*Hodzic v. Fedex Package Sys., Inc.*,
No. CV 15-956, 2016 WL 6248078 (W.D. Pa. Oct. 26, 2016) .............................................38

*Hoffman-LaRoche, Inc. v. Sperling*,
493 U.S. 165 (1989).........................................................................................................23, 27

*Hughes v. Township of Franklin*,
No. 13-3761, 2014 WL 1428609 (D.N.J. Apr. 14, 2014).......................................................35

*In re Morgan Stanley Smith Barney LLC Wage and Hour Litig.*,
No. 11-3121, 2016 WL 1407743 (D.N.J. Apr. 11, 2016)................................................25, 37

*King v. West Corp.*,
No. 04-318, 2006 WL 118577 (D. Neb., Jan 13, 2016).........................................................27

*Kronick v. Bebe Stores, Inc.*,
No. 07-4514, 2008 WL 4546368 (D.N.J. Oct. 2, 2008) ........................................................24

*Mike v. Safeco Ins. Co. of Am.*,
274 F. Supp. 2d 216 (D. Conn. July 15, 2003) ..............................................................31, 33

*Morisky v. Pub. Serv. & Gas*,
111 F.Supp.2d 493 (D.N.J. Aug. 15, 2000) ....................................................................27, 28

*Naicker v. Warrior Energy Servs., Inc.*,
No. 2:14-CV-01140, 2015 WL 1642209 (W.D. Pa. Apr. 9, 2015).........................................38

*Reed v. Empire Auto Parts, Inc.*,
No. 13-5220, 2015 WL 761894 (D.N.J. Feb. 23, 2015) ..................................................24, 25

*Ruffin v. Avis Budget Car Rental*,
No. 11-01069, 2012 WL 2514841 (D.N.J. June 28, 2012).....................................................31

*Sloane v. Gulf Interstate Field Servs., Inc.*,
No. 16-01571, 2017 WL 1105236 (M.D. Pa. Mar. 24, 2017) .....................................25, 26, 30

iv

## <u>TABLE OF AUTHORITIES</u>
(continued)

**Page(s)**

*Smith v. Sovereign Bancorp, Inc.*,
    No. 03-2420, 2003 WL 22701017 (E.D. Pa. Nov. 13, 2003) ..................................................23

*Symczyk v. Genesis Healthare Corp.*,
    656 F.3d 189 (3d Cir. 2011)..........................................................................................23, 24

*Wright v. Lehigh Valley Hosp.*,
    No. 10-431, 2010 WL 3363992 (E.D. Pa. Aug. 24, 2010) ......................................................35

**STATUTES**

29 U.S.C. § 213(a)(1)................................................................................................................28

29 U.S.C. § 216(b) ...........................................................................................................1, 23, 31

**OTHER AUTHORITIES**

29 C.F.R. § 541.100(a)...............................................................................................................28

29 C.F.R. § 541.102 ...................................................................................................................29

29 C.F.R. § 541.700(a)...............................................................................................................29

## I.  INTRODUCTION

Plaintiffs demand a Court-approved solicitation notice to over 1,550 Assistant General Managers ("AGMs") that would stir up Fair Labor Standard Act ("FLSA") litigation for hundreds of others and consume substantial judicial resources.  They support this demand with repeated misrepresentations of Wawa's Federal Rule 30(b)(6) testimony, a job description and training materials that Plaintiffs themselves assert have nothing to do with AGMs' actual duties, and wild speculation by Plaintiffs (less than 1% of the 1,550 AGMs) about the duties and supervision of AGMs at hundreds of independent locations.  Plaintiffs' testimony confirms differences among their duties material to the application of the executive exemption, and several AGMs who Plaintiffs seek to represent have offered declarations describing varying duties entirely unlike Plaintiffs' own claimed experiences.  The fact-based standard for conditional certification may be modest, but it is surely not nonexistent, and it must be applied in order to avoid automatic certification in every FLSA collective action.  Plaintiffs' Motion should be denied.

## II.  PLAINTIFFS AND AGMS ARE NOT SIMILARLY SITUATED.

### A.  Plaintiffs Premise Their Motion Primarily On Their Misrepresentation Of Wawa's FRCP 30(b)(6) Testimony.

Plaintiffs contend that the testimony of Rebecca Altemus ("Ms. Altemus"), was "so clear and complete that it by itself would sustain Plaintiffs' light burden to

support Section 216(b) certification." Pls' Mem. at 4. In reality, Plaintiffs grossly

mischaracterize the testimony throughout their brief.

### 1.    Plaintiffs Misrepresent Testimony Regarding Job Duties.

Plaintiffs falsely claim that Ms. Altemus "admitted that all AGMs have the

same primary duties as described in the Job Description" and that "the primary

duties as outlined in the job description of AGMs are the same regardless of the

[AGMs'] prior experience" and "[t]he Store Manager under with the AGM

worked," among other factors. Pls' Mem. at 4. That was not her testimony.

Far from supposedly "admit[ing] that AGMs have the same primary job

duties as described in the Job Description," Ms. Altmeus testified that although the

Description says it lists the "[e]ssential functions of an [AGM]," she did "***not***

***agree***" that AGMs performed "***all***" of those duties. Ex. A, Altemus Dep. at 59:13-

19 (emphasis added).[1] For instance, the Job Description states that AGMs should

"ensure the planning and execution of [policies]," but Ms. Altemus testified that

"that's something that [AGMs] ***may*** be doing." *Id.* at 52:23-53:5 (emphasis added).

So Plaintiffs are wrong that Wawa "demands that ***all*** AGMs" perform this duty.

Pls' Mem. at 10 (emphasis added). Moreover, the Job Description states that

AGMs ensure the execution of action plans, but action plans are ***not*** used by all

stores:

---

[1] Excerpts from the relevant deposition transcripts are attached as Exhibits ("Ex.")
A through H of the Declaration of Keri L. Engelman filed herewith.

2

> Q.      What stores don't use action plans?
>
> A.      ***It depends***.  If a store's performing very well, an area manager would not assign an action plan.  If an area [sic] manager is not somebody that typically assigns action plans, the store wouldn't get one . . . . If the general manager wasn't the best general manager, even though he's told to do an action plan, he might not do an action plan.  So I would not say it's every store.

*Id*. at 56:3-15. (emphasis added).

Plaintiffs further claim that "[Ms.] Altemus testified that AGMs' duties are the same in all stores throughout the country."  Pls' Mem. at 4.  In doing so, Plaintiffs point ***only*** to Ms. Altemus's testimony that the Job Description itself does not specifically say that AGMs' duties differ in the real world.  Ex. A, Altemus Dep. at 183:9-184:6 (emphasis added).  But that certainly does not mean that AGMs' ***actual*** duties are in fact the same.  Likewise, Plaintiffs claim that "AGMs' duties and functions are the same through the company at all locations."  Pls' Mem. at 4.  Ms. Altemus's testimony described in this section shows the opposite is true.[2]

Most troubling, Plaintiffs represent that Ms. Altemus testified that AGMs' duties were identical across the country, but she said the opposite:

> Q.      What is your understanding of the primary duties of an AGM?
>
> A.      . . . [T]hey assist the general manager in the store operations.

---

[2] The remaining testimony that Plaintiffs cite in support of this statement merely confirms that the Job Description – rather than AGMs' actual duties – was uniform.  Ex. A, Altemus Dep. 45:20-60:2.

3

> Q.      . . . [W]ould AGMs be assisting the general manager in store operations for all the Wawa stores nationwide?
>
> A.      ***Not necessarily***. . . . *[i]t would depend*. . . . ***It would depend on what the general managers' expectations were of their team, it would depend on how the AGM was, it would depend on if they were a lower performer***.

Ex. A, Altemus Dep. at 181:14-182:9 (emphasis added).  Ms. Altemus was right, as Plaintiffs and other AGMs confirm that their duties varied.  *See infra* at 14-15, 20-22.

## 2.      Plaintiffs Misrepresent Testimony Regarding Training.

Plaintiffs also claim, relying solely on Ms. Altemus's testimony, that the Learning Map is "used by ***all*** AGMs" and "is provided to ***all*** AGMs nationwide." Pls' Mem. at 9 (emphasis added).  She actually testified that the Map is ***not*** applicable to ***any*** AGM who was hired prior to May 6, 2014 (the operative date of the Map), and that she did not know whether "[a]ll the AGMs" hired into the position after that date would have used the Map.  Ex. A, Altemus Dep. 128:5-24. Indeed, approximately 1,077 AMGs – or ***69% of the putative collective action members*** – were hired into the AGM role prior to May 6, 2014 and thus would have ***never used the Learning Map***.  Altemus Declaration ("Altemus Decl.") (Ex. W), ¶¶ 3-4.  And the Map did not apply to most of the Plaintiffs.  *See infra* at 4, 33.

Plaintiffs further claim that Ms. Altemus testified that all other AGM training is uniform.  Pls' Mem at 9.  To the contrary, she explained that "***[t]he***

4

*training would differ depending on the AGM*."  Ex. A, Altemus Dep. at 116:4-5.

The AGM training would "depend[] on which modules were assigned" and "if the

[AGM] were internal[ly] promoted or [hired] externally."  *Id.* at 116:8-25.

Moreover, training evolved over time and thus varied depending on when the

AGM started.  *Id.* at 128:10-13.  This is corroborated by the varied training

experiences of Plaintiffs and Wawa's declarants.  *See infra* at 11-14, 17-18.

### 3.     Plaintiffs Misrepresent Testimony Regarding Policies.

Plaintiffs contend that "Wawa produced [Ms. Altemus] to testify *inter alia*

as to their corporate policies as it applied [to] the AGMs chain wide."  Pls' Mem.

at 3.  But Plaintiffs did not even seek 30(b)(6) testimony regarding Wawa's

"corporate policies," so Wawa did not offer Ms. Altemus on this topic.[3]  *See*

Objections and Responses to Plaintiffs' 30(b)(6) Deposition Notice (Ex. V).

Citing Ms. Altemus's testimony only, Plaintiffs claim that "Wawa has

common work rules for all AGMs in the corporately-derived Company Policy

Manual [], which mandates the duties and tasks of AGMs and strictly controls how

those duties and tasks are performed" and that "[a]ll AGMs must adhere to the

company handbook."  Pls' Mem. at 11.  In reality, no testimony regarding the

Policy Manual or the Handbook contains any discussion of AGMs' "duties and

---

[3] Per the parties' agreement, the only policies Ms. Altemus was offered to testify to
were those regarding the supervision of AGMs effective during the relevant time
period.

tasks."  Ex. A, Altemus Dep. at 65:21-67:8 (Policy Manual has mere administrative policies such as the dress code policy, paid time off policy, store policies and Company Handbook merely contains "information[]" about Wawa generally).[4]

Plaintiffs also claim that "Wawa AGMs must follow the 'Hourly Guidelines,' from the corporate offices [which are] guidelines from the corporate offices that AMGs must delegate or complete '*every hour on the half hour*.'"  Pls' Mem. at 10.  In fact, the testimony was that "Eye of the Customer Hourly Guidelines" are "customized per store"; only some AGMs may use them while others "probably do not"; and their use would "depend[] on . . . how much the general manager focuses on it, how much the area manager focuses on it, . . . [and] who else might else be doing it inside of the store."  Ex. A, Altemus Dep. at 76:1-15, 92:7-94:4.  Even worse, relying again *exclusively* on Ms. Altemus, Plaintiffs state that "B.E.S.T." forms are "uniform instruction guides from corporate offices that *all* AGMs were expected to use" on a "daily" basis.  Pls' Mem. at 10 (emphasis added).  But Ms. Altemus explained:

> Q.    And would all of the stores nationwide have used the Daily
>        B.E.S.T. Forms? . . .

---

[4]  Not surprisingly, Wawa's Corporate Policy Manual and Employee Handbook are general documents applicable to all Wawa employees rather than AGMs in particular.  Ex. W, Altemus Decl. ¶ 5.

A.   *No*. . . . [a]gain, it ***depends on the area manager, how hard their focus is on it, the general manager, how hard their focus is on it*** . . . ***depending on the seasonal changes or regional focuses [], they might need to focus on different thing daily.***

Q.   And do the AGMs utilize this form?

A.   ***Some might.***   Again, I think it depends on how [] if they're a good AGMs, high-performing AGM …[] it depends on if a store, again focuses on this [] if the area manager focuses on it and the general manager focuses on its.   And then depending on the shift, if they're working say they're working side-by-side that shift with the FBM, the FBM might actually be the one assigning the shifts or CSS might be assigning the shifts, and you, following up one it delegated tasks, so an AGM may or may not have used it."

Ex. A, Altemus Dep. at 73:9-20, 82:16-24 86:8-87:20.  The testimony that

Plaintiffs cite indicates at most only that Wawa "hop[ed]," but did not require, that

the Wawa stores as whole – not the AGMs themselves, but any other employee at

an AGM's or GM's direction – would complete some of the tasks on the B.E.S.T.

Form. *Id.* at 74:1-75:7.

### B.   Plaintiffs Uniformly Disclaim The Job Description That Is A Key Premise For Their Motion.

Plaintiffs also rely heavily on the AGM Job Description as supposed proof

of uniformity among AGMs' duties.  Pls' Mem. at 4, 7-8.  They repeatedly assert

that "[a]ll AGMs have the same primary duties as described in the Job

Description" and that "each of these AGMs fall under a single corporately-derived

job description."  *Id.* at 4, 8.  But the Job Description states the opposite – that it is

"intended to describe the ***general nature*** and level work being performed by

7

people assigned to this classification. ***These statements are not an exhaustive list of all responsibilities, duties and skills required of the personnel so classified***." *See* January 1, 2014 AGM Job Description (Ex. I) (emphasis added).

Moreover, the Job Description is not used by any AGMs and is principally used only to evaluate whether someone with a disability is able to return to work. Ex. A, Altemus Dep. at 49:8-50:9. That is why it details every possible duty that an AGM may ever perform, with a focus on any physical tasks. *Id*.

Plaintiffs' reliance on the Job Description is perplexing given that they uniformly denied that it accurately described their duties. *See, e.g.,* Ex. B, Gervasio Dep. at 372:16-22 ("Q. So would you agree that pages 1 and 2 of this document do not accurately reflect what you did as an AGM, generally speaking? A. They didn't reflect what I did as an AGM, no."); Ex. E, Carmany Dep. at 138:11-20 ("Q. So this is not really accurate with respect to what you did as an AGM? A. No."); Ex. D, Cloud Dep. at 165:2-9; 167:12-16 ("Q. Okay. So we can't use this job description to determine, what, in fact you did as an AGM? A. No, because it's not accurate."); Ex. C, Dinse Dep. at 181:4-6, 11-14 ("Q. So whatever job description describes, that wasn't your job as an AGM. A. Correct"); Ex. G, Watkins Dep. at 48:3-6 ("Q. Would you say that this job description represents the job that you were performing? A. No.").

Unlike Plaintiffs, however, other AGMs have performed many management duties listed in the Job Description in varying ways and to varying degrees. *See infra* at 20-22. This sharply contrasts with the alleged experiences of Plaintiffs:

> Q.   Would you agree that if an AGM was performing duties listed under principal duties, one through nine, that they were performing a different job than you were? . . .
>
> A.   Yes.

Ex. H, Romolini Dep. at 118:3-10; 123:18-124:2. In sum, if it has any bearing on the Motion at all, the Job Description actually weighs against certification.

### C.   Plaintiffs Know Nothing About The Duties Of Other AGMs.

Given the foregoing, this Court thus is left to decide the Motion based only on the alleged experiences of the handful of Plaintiff who admittedly lack knowledge regarding the other 1,550 AGMs – over 99% of the putative collective action members.[5] Plaintiffs' cannot offer a shred of information regarding other AGMs' varying day-to-day job duties and responsibilities,[6] whether other AGMs

---

[5] Moreover, several of the Plaintiffs left Wawa in 2014 – *__before the maximum limitation period for any AGM who could now opt into this case__*. Ex. D, Cloud Dep. at 108:23-109:2; Ex. C, Dinse Dep. at 14:13-24; Ex. F, Fitzgerald Dep. at 40:9-20. So they know nothing about AGMs' duties during the only pertinent time period for individuals who could opt into this case. Ex. D, Cloud Dep. at 145:11-15; 148:13-149:1; 151:6-152:14; Ex. C, Dinse Dep. at 67:11-13; Ex. F, Fitzgerald Dep. at 40:9-20.

[6] *See*, *e.g.*, Ex. B, Gervasio Dep. at 97:15-20; Ex. D, Cloud Dep. at 66:10-14, 150:20-151:2, 152:2-14, 243:8-11, 265:22-24; 289:20-23, 290:24-291:2; Ex. C, Dinse Dep. at 132:8-23, 133:13-137:9, 143:11-14, 144:11-13, 205:18-20, 225:8-10, 268:18-270:12, 272:13-24, 278:14-17, 279:11-18, 281:2-15, 290:8-292:2, 294:10-

performed their jobs consistent with the Job Description,[7] how other AGMs used their varying education and experience to carry out varying duties,[8] the varying training other AGMs received through Wawa that informed their duties,[9] or the level of discretion given to other AGMs by their respective GMs to carry out management duties.[10] Plaintiffs thus have no personal knowledge showing that hundreds of other AGMs – or any AGMs at all – are similarly situated to them. [11]

---

12, 295:2-4, 298:21-299:2, 311:12-316:20; Ex. F, Fitzgerald Dep. at 49:3-9, 56:9-59:16, 60:15-18, 71:14-17, 71:23-72:2; Ex. H, Romolini Dep. at 103:3-104:21, 106:5-108:10, 110:6-25; Ex. G, Watkins Dep. at 19:19-22, 25:9-27:22, 29:11-15, 166:10-12.

[7] *See, e.g.*, Ex. B, Gervasio Dep. at 365:24-370:7, 374:2-375:9; Ex. D, Cloud Dep. at 166:22-167:1, 168:3-8; Ex. E, Carmany Dep. at 130:6-10; Ex. C, Dinse Dep. at 182:7-23; Ex. G, Watkins Dep. at 50:1-51:7, 54:24-55:4; Ex. H, Romolini Dep. at 118:3-123:17.

[8] *See, e.g.*, Ex. B, Gervasio Dep. at 42:5-15, 111:24-112:2; Ex. D, Cloud Dep. at 35:18-36:9; Ex. C, Dinse Dep. at 20:21-21:3; Ex. H, Romolini Dep. at 30:22-31:2.

[9] *See, e.g.*, Ex. B, Gervasio Dep. at 119:15-22; Ex. D, Cloud Dep. at 283:17-22, 284:17-19, 290:18-20, 291:21-23, 300:13-15, 301:19-21, 306:21-23, 307:2124, 310:17-314:4; Ex. C, Dinse Dep. at 258:18-23, 268:14-17, 272:3-8, 278:14-279:14, 300:2-12, 311:12-316:20; Ex. F, Fitzgerald Dep. at 42:7-15, 43:23-44:3, 50:19-22, 52:16-21, 55:6-9, 56:9-14; Ex. G, Watkins Dep. at 43:19-44:5.

[10] *See, e.g.*, Ex. B, Gervasio Dep. at 141:17-20; Ex. D, Cloud Dep. at 63:15-18, 247:9-14; Ex. F, Fitzgerald Dep. at 57:7-11.

[11] Plaintiffs' lack of knowledge regarding the varying experiences of other AGMs is further reinforced by that fact they were generally the only AGMs employed at their respective stores at any given time. Ex. C, Dinse Dep. at 11-16; Ex. B, Gervasio Dep. at 421:18-20; Ex. D, Cloud Dep. at 56:7-9; Ex. H, Romolini Dep. 39:12-13, 46:24-25. In other words, they did not observe other AGMs working in their own stores, let alone other AGMs employed in 750 stores spread across six states.

At most, three Plaintiffs claim minimal knowledge of other AGMs based on visiting other stores for a few minutes each week.  Ex. B, Gervasio Dep. at 97:8-19 (but "no way of knowing" AGM' duties the rest of the shift); Ex. C, Dinse Dep. at 365:8-366:4 (but no idea how those AGMs spent "95, 99 percent of the time"); Ex. F, Fitzgerald Dep. at 47:7-48:18 (but admitting that he otherwise has no knowledge of other AGMs).  This is insufficient to show common duties among 1,550 AGMs.

### D.    Plaintiffs' Experiences Were Different Even From One Another.

#### 1.    Plaintiffs Received Varying Training.

Plaintiffs believe that training received by AGMs informs their duties since they (falsely) point to allegedly common training to assert that AGMs are similarly situated across the country. *See supra* at 4-5.   In reality, AGMs undergo widely varying training depending on, among other factors, whether they were hired internally or externally, the curriculum at the time, their prior education and experience, and their GMs' preferences.  *See supra* at 4-5; *see also infra* at 17-18. This is best demonstrated by the varying training of the Plaintiffs themselves.

By way of example, Plaintiff Gervasio was promoted to AGM after working in many other management positions at Wawa and another company.  Ex. B, Gervasio Dep. 46:5-56:22.  Given this experience, ***Plaintiff Gervasio did not undergo any training*** for the AGM position other than a few sporadic computer-based classes.  Ex. B, Gervasio Dep. at 119:3:120:2 (testifying that Wawa "told

11

[him] that [he] had been there so long basically that [he] had worked his way up, so [training] wasn't necessary" and he did not attend any workshop at Wawa University).

Plaintiff Dinse also became an AGM after holding other Wawa management jobs.  Ex. C, Dinse Dep. at 23:19-24:17.  Yet, unlike Plaintiff Gervasio, as he participated in a one-week, in-person training at Wawa University.  *Id*. at 71:1-72:2.  In contrast, Plaintiff Carmany was hired externally and so was required to undergo a one-month, in-person training at a training store.  Ex. E, Carmany Dep. at 84:8-85:9.

At the other end of the spectrum from Plaintiffs Gervasio and Dinse, Plaintiffs Cloud and Romolini were hired externally in 2011 and underwent a **three-month**, in-store training program.  Ex. D, Cloud Dep. at 19:4-20:14; Ex. H, Romolini Dep. at 34:25-35:17.  Others had varied training depending on prior experience, when they started as AGMs, and whether they were hired or promoted. *See infra* at 17-18.

Training also varied from AGM to AGM because Wawa was constantly updating its course curriculum over time.  Ex. A, Altemus Dep. at 128:10-12.  The following contains a list of just some of varying courses that Plaintiffs took:[12]

---

[12] Opt-In Plaintiff Romolini testified that the computer-based trainings that he received related to "safety, theft, proper cash handling," and that unlike Plaintiffs Cloud, Dinse, and Carmany who were trained on varying management functions as

| Cloud | Carmany | Fitzgerald |
|---|---|---|
| • Leading Change at Every Level<br>• Motivating the Workforce<br>• Motivating Your Associates<br>• Time Management<br>• EIM Reports and Navigation<br>• Article Level Inventory | • Learning Experience Redesign Roll-Out for AGMs & FBMs<br>• Drop Loans and Till Management<br>• Safety & Physical Security<br>• Fuel Management Workshop<br>• Fuel Management Performance Demonstration | • Emotional Intelligence<br>• Five Dysfunctions of a Team<br>• Maintaining Positive Relationship with Associates<br>• Recruitment Strategies |

*See* Cloud Skills, attached as Ex. T; Carmany Skills, attached as Ex. S; and

Fitzgerald Skills attached as Ex. U.

It is obvious from this chart that there is nothing uniform about training at

Wawa.  For instance, since the "Learning Map" is a focus for Plaintiffs' (*see supra*

at 4), it is worth noting that the Map did not even apply to Plaintiffs Gervasio,

Cloud, Dinse, Romolini, Watkins, Schultz, Fitzgerald, and Hicks.  Each started as

an AGM before the Learning Map existed (May 2014).  *See supra* at 4.

Finally, even if Plaintiffs had training on any similar topics, they generally

denied that they used the training or that it was reflective of their roles as AGMs.

Ex. B, Gervasio Dep. at 409: 3-20; Ex. E, Carmany Dep. at 84:20-5; Ex. C, Dinse

---

described above, ***Romolini testified that he did not remember being trained on "any managerial-type functions."*** Ex. H, Romolini Dep. at 125:20-128: 25.  Opt-In Plaintiff Fitzgerald testified, in contrast, that the trainings "varied" and he is "sure" that he was trained on "management-type" functions, such as on "scheduling" and "human resources." Ex. F, Fitzgerald Dep. at 42:16-43:2.

Dep. at 114:80-30; Ex. D, Cloud Dep. 76:4-14; Ex. F, Fitzgerald Dep. at 43:3-23;

Ex. H, Romolini Dep. at 172:4-12.  In sum, the training (according to Plaintiffs)

had nothing to do with their duties and thus cannot show that AGMs are similarly

situated for purposes of exempt status.

### 2.     Plaintiffs' Day-to-Day Duties Varied.

Plaintiffs performed varying exempt duties, depending on their stores/GMs:

- ***Interviewing and Selecting Employees***: Opt-In Plaintiff Fitzgerald testified that whether he conducted interviews of potential candidates and was otherwise involved in the hiring process "var[ied]" depending on the store in which he was working.  Ex. F, Fitzgerald Dep. at 50:24-51:18.  Plaintiff Gervasio conducted the first-round phone interview confirming the individual's availability, conducted the in-person second interview with the candidate along with GM, and he and the GM would have discussions about the potential candidates.  Ex. B, Gervasio Dep. at 219:5-20, at 323:14-324:21, 431:8-17.  By contrast, Opt-In Plaintiff Romolini was often responsible for both the initial phone and then in-person interviews, and he and made specific recommendations to the GM as to who should be hired.  Ex. H, Romolini Dep. at 59:14-61:2, 62:15-63:18.  Romolini in fact testified that he conducted over 50 interviews, including in-person second-round interviews, during his tenure as an AGM.  *Id.*  Plaintiff Cloud and Plaintiff Dinse, on the other hand, testified that they only conducted pre-screen phone interviews where they confirmed availability and did not have any conversations with the GM about who should be hired. Ex. D, Cloud Dep. at 59:12-16; Ex. C, Dinse Dep. at 208:4-7.

- ***Ensuring Appropriate Staffing***: Opt-In Plaintiff Fitzgerald testified that whether he completed the schedule "varied from store to store and manager to manager" as "some managers did complete the schedule themselves [] [and] some managers allowed [him] to do it."  Ex. F, Fitzgerald Dep. at 50:4-18. Plaintiff Cloud testified that he was responsible for completing the schedule, but the frequency in which he did so depended on the varying preferences of the GM at his store.  Ex. D, Cloud Dep. at 54:16-23; 108:5-10, 257:2-9.  Plaintiff Gervasio testified that he was responsible for completing the schedule at one of the stores in which he worked as an AGM, but not the others.  Ex. B, Gervasio Dep. at 197:4-23. Plaintiffs Carmany, Dinse, and Romolini, on the other hand,

testified that they never had any responsibility for the schedule. Carmany Dep at 119:14-17; Ex. C, Dinse Dep. at 218:1-219:6; Ex. H, Romolini Dep. at 107:4-6.

- ***Appraising Employees' Productivity and Efficiency***:  Plaintiffs Gervasio and Romolini testified that they conducted associate performance evaluations and the evaluation meetings in one of their stores, but not the others. Ex. B, Gervasio Dep. at 325:22-326:8; Ex. H, Romolini Dep. at 165:20-166:9. Plaintiffs Carmany and Fitzgerald testified that they never completed any associate performance evaluations, but some GMs asked them for input on associate performance while other GMs did not. Ex. E, Carmany Dep. at 141:4-141:21; Ex. F, Fitzgerald Dep. at 54:16-55:5.  Plaintiff Dinse, in contrast, never had responsibility for evaluating associate performance.  Ex. C, Dinse Dep. at 268:14-269:3.

- ***Disciplining Associates***: Plaintiffs Gervasio and Cloud testified that they never had any discretion to discipline associates.  Ex. B, Gervasio Dep. at 354:18-356:10; Ex. D, Cloud Dep. at 58:22-24.  But Plaintiff Fitzgerald had the discretion to draft disciplinary forms.  Ex. F, Fitzgerald Dep. at 51:23-52:4. Plaintiff Dinse had the discretion to "initiate" discipline, would complete associate disciplinary forms, and would hold discipline meetings.  Ex. C, Dinse Dep. at 231:3-17.  Plaintiff Romolini had the authority to discipline through a "conversation," but not to complete disciplinary documentation. Ex. H, Romolini Dep. at 144:7-145:25.

- ***Coaching/Training Associates***: Plaintiff Gervasio testified that he did not coach associates or monitor their training.  Ex. B, Gervasio Dep. at 248:22-249:19. Opt-In Plaintiff Romolini did coach associates and was responsible for ensuring that all associates completed their training.  Ex. H, Romolini Dep. at 72: 3-15.

- ***Ordering Products***: Plaintiff Gervasio testified that he had no involvement in ordering products.  Ex. B, Gervasio Dep. at 392:21-23.  Plaintiff Romolini testified that he was responsible for ordering on certain days (Ex. H, Romolini Dep. at 112: 1922), and Plaintiff Dinse testified that he approved product orders weekly.  Ex. C, Dinse Dep. at 189:22-191:14.

- ***Absence and/or Presence of Other Management***: Gervasio had a four-month period during which his store had no GM, and, therefore, he was the most

15

senior manager in the store.  He took on more responsibility during that time, including performance evaluations.  Ex. B, Gervasio Dep. 326:2-8.  Plaintiffs Cloud and Romolini reported to the General Manager in Training ("GMIT"), rather than the GM, when one was present.  Ex. D, Cloud Dep. at 46:2-7; Ex. H, Romolini Dep. at 38:23-39:5. Plaintiff Dinse testified that his responsibilities "changed" after the GMIT left one of the stores where he worked.  Ex. C, Dinse Dep. at 39:4-10.  But Plaintiff Carmany never worked with a GMIT.  Ex. E, Carmany Dep. at 28:5-10.

- *__Working Styles of GM__*: Plaintiff Carmany testified that after his training he worked entirely independent of the GM, while Plaintiff Dinse testified that he worked side-by-side with the GM half of the time. Ex. E, Carmany Dep. at 114:15-20; Ex. C, Dinse Dep. at 48:5-14. Plaintiff Fitzgerald confirmed that GM working styles varied "manager by manager."  Ex. F, Fitzgerald Dep. at 50:16-17.

- *__Varying Communication with GM__*: Plaintiff Cloud testified that he would call his GM, day or night, each and every time an issue arose and the GM would provide him with the exact solutions/responses. Ex. D, Cloud Dep. at 47:8-48:2. Romolini would email with his GM issues that arose, and the GM would not respond.  Ex. H, Romolini Dep. at 51:21-52:15.  Plaintiff Gervasio testified that he would call, text, or email the GMs at all hours of the day.  Ex. B, Gervasio Dep. at 86:1-87:6.  By contrast, Plaintiff Carmany testified that he and his GM would leave notes for one another and hold a 15 to 20-minute phone call once a week to discuss issues.  Ex. E, Carmany Dep. at 114:21-116:1.

In sum, Plaintiffs' testimony shows that to determine whether any particular AGM met the executive exemption, one must evaluate the AGM's specific day-to-day duties and the amount of time that they spent on each duty.  *See infra* at 24-26.

### E.    Plaintiffs Are Not Representative of Other AGMS.

#### 1.    Several Plaintiffs Were Terminated for Poor Performance.

Plaintiffs claim they "spen[t] the majority of their workdays performing non-exempt, retail clerk duties."  Pls' Mem. at 1.  That may be so, as most of them were

weak managers who thus were terminated for poor performance.[13]  Ex. D, Cloud

Dep. at 87:2-6; Ex. G, Watkins Dep. at 62:22-24; Ex. F, Fitzgerald Dep. 61:11-21;

Ex. E, Carmany Dep. at 82:2-5.  And Plaintiff Gervasio stopped showing up for

work after being placed on a Performance Improvement Plan ("PIP").  Ex. B,

Gervasio Dep. at 331:7-332:11.[14]  Plaintiff Cloud did the same because he was

passed over for a promotion. Ex. D, Cloud Dep. at 96:21-97:17.  In sum, these

supposedly "representative" Plaintiffs were outliers who found it easier to do the

task work themselves than to manage people and store operations.  Wawa's

declarations show that is not a common experience.

### 2.   Other AGMs Received Varying Training.

The declarations submitted by Wawa confirm that other AGMs received

varying training depending on a number of factors, such as whether they were

hired internally or externally and the GMs' preferences.  Ex. N, Gordon Decl. ¶ 1

("Because I already received significant training when I was first hired as an IMM,

I did not do much training at all when I became an AGM."); Ex. P, Pedano Decl. ¶

---

[13] Plaintiff Dinse did not actively engage associates, failed to hold associates accountable, and failed to proficiently analyze financial reports and trends.  *See* 2013 Store Operations Form for Michael Dinse (Ex. J).

[14] Plaintiff Gervasio "[did] not fully understand what the expectations is for labor," he thus "did not hold the associates [] to any standard," and " no one knows what's going on in the store on [Gervasio's] watch."  *See* 2015 Store Operations Form for Anthony Gervasio (Ex. K).

2 ("[B]ecause I had already undergone a significant amount of training when I was first hired as an IMM, my GM preferred that my AGM-specific training be more hands-on [rather than class room and computer-based].");  Ex. Q, Robey Decl. ¶ 2 ("I took a few computer-based courses related to the new responsibilities I would take on.");  Ex. O, King Decl. ¶ 3 ("Because I had not been a Wawa employee before I became an AGM, I underwent a couple different types of formal training at 5101, which was a training store, that was more focused and far more extensive than for AGMs who were promoted within the company.").  These declarations, coupled with Plaintiffs' testimony, leave no doubt that training varies widely among AGMs.

### 3.    Other AGMs Focused On Management In Varying Ways.

In contrast to Plaintiffs, the declarations submitted by Wawa show that other AGMs spend most of their time on managerial duties, depending on the person and store where they worked, among other factors.  These AGMs dedicated most of their time to performing the following management functions: scheduling associates,[15] interviewing and hiring,[16] associate training and development,[17]

---

[15] Ex. P, Pedano Decl. ¶ 4, 8; Ex. Q, Robey Decl. ¶ 4; Ex. O, King Decl. ¶ 4; Ex. M, Goshey Decl. ¶ 4; Gonzalez Decl. ¶¶ 5, 8; Ex. R, Swanson Decl. ¶¶ 7-8.

[16] Ex. P, Pedano Decl. ¶¶ 6, 11; Ex. Q, Robey Decl. ¶ 6; Ex. O, King Decl. ¶¶ 7-8; Ex. N, Gordon Decl. ¶ 10; Ex. M, Goshey Decl. ¶ 5; Gonzalez Decl. ¶ 7; Ex. R, Swanson Decl. ¶ 4.

18

directing, supervising, and coaching associates,[18] disciplining associates,[19]

managing cash and analyzing the store's metrics,[20] conducting associate

performance appraisals,[21] assisting in the termination of associates,[22] resolving

customer complaints,[23] and ensuring store safety compliance.[24]

AGMs devote differing amounts of time to performing the managerial

functions discussed above, including depending on the store where they worked.

Ex. M, Goshey Decl. ¶¶ 8, 12 (spent 70% of his time on exempt duties in Store

8314 and 50% of his time on exempt duties in Store 909); Ex. P, Pedano Decl. ¶ 10

(spent 60% of her time on exempt duties in Store 957); Ex. Q, Robey Decl. ¶ 5

(spent 80% of her time on exempt duties); Ex. M, Goshey Decl. ¶ 3 (spent 70% of

his time on exempt duties in Store 8314 and 50% of his time on exempt tasks in

---

[17] Ex. P, Pedano Decl. ¶ 7; Ex. Q, Robey Decl. ¶ 7; Ex. O, King Decl. ¶ 9; Ex. N, Gordon Decl. ¶ 8; Ex. M, Goshey Decl. ¶¶ 6-12; Ex. L, Gonzalez Decl. ¶¶ 5, 9; Ex. R, Swanson Decl. ¶ 5.

[18] Ex. P, Pedano Decl. ¶ 10,12; Ex. O, King Decl. ¶ 4; Ex. M, Goshey Decl. ¶¶ 6, 8; Ex. L, Gonzalez Decl. . ¶ 4; Ex. R, Swanson Decl. ¶ 6.

[19] Ex. P, Pedano Decl. ¶ 12; Ex. Q, Robey Decl. ¶ 7; Ex. N, Gordon Decl. ¶ 11; Ex. M, Goshey Decl. ¶ 6; Ex. L, Gonzalez Decl. . ¶ 10; Ex. R, Swanson Decl. ¶ 6.

[20] Ex. P, Pedano Decl. ¶ 9; Ex. Q, Robey Decl. ¶ 5; Ex. O, King Decl. ¶ 5; Ex. N, Gordon Decl. ¶ 9; Ex. M, Goshey Decl. ¶ 7.

[21] Ex. P, Pedano Decl. ¶ 13; Ex. Q, Robey Decl. ¶ 7; Ex. O, King Decl. ¶ 10; Ex. N, Gordon Decl. ¶ 12; Ex. M, Goshey Decl. ¶ 9; Ex. R, Swanson Decl. ¶ 8.

[22] Ex. P, Pedano Decl. ¶14; Ex. O, King Decl. ¶ 11; Ex. N, Gordon Decl. ¶ 13; Ex. M, Goshey Decl. ¶13; Ex. R, Swanson Decl. ¶ 6.

[23] Ex. O, King Decl. ¶ 12; Ex. L, Gonzalez Decl. ¶ 14.

[24] Ex. O, King Decl. ¶ 9, Ex. L, Gonzalez Decl. ¶ 11.

Store 909); Ex. N, Gordon Decl. ¶ 6 (spent 60% of his time on exempt duties in

Store 835 and 480); Ex. O, King Decl. ¶ 13 (spent 50% of her time on exempt

duties); Ex. R, Swanson Decl. ¶ 8 (spent 50% of his time on exempt duties during

evening shift, but non-exempt task work "dropped well below 50 percent of [his]

time when [he] worked day shifts").

**4.    AGMs' Duties Vary Based on A Number of Factors,
Including GM Preferences, Size and Location of Store,
Associate Experience Level, Among Other Things.**

Plaintiffs claim that the "primary duties" of AGMs are the "same" regardless

of location, size, sales volume, prior experience, and the GM for the store.  Pls.'

Mem. at 4.  But there is no record evidence whatsoever that this is true for the over

1,550 AGMs to whom Plaintiffs seek to send notice.  And the declarations that

Wawa submitted confirm that AGMs' duties – and the amount of time that they

spend on any particular duty – vary significantly based on many factors:

- ***Differing GM Styles and Preferences***: Ex. N, Gordon Decl. ¶ 9 (GM at Store 720 had a "divide and conquer" approach so Gordon was responsible only for the discrete management tasks assigned to him whereas the GM at Store 398 had a "let's figure this out together" approach where they worked together on carrying out the management responsibilities based on the changing needs of the store); Ex. M, Goshey Decl. ¶ 10 (GM in Store 909 tended to manage him closely, and for example, wanted to be involved in every step of the associate training process whereas a different GM at Store 909 gave him complete discretion to handle associate training); Ex. R, Swanson Decl. ¶ 3 (one of his GMs was very "hands off" while the other was more of a "micromanger").

- ***AGM Shift/Presence of Other Management***:  *Compare* Ex. P, Pedano Decl. ¶ 6 (more time to perform exempt duties during the Day Shift); *with* Ex. O, King Decl. ¶ 3 (worked alongside the GM approximately twice a week in Store 5101

20

during which she was responsible for the associates working on the registers and the deli, whereas the GM completed all of the paperwork); *with* Ex. O, King Decl. ¶ 4 (worked the Day Shift at a different store when there was no GMIT in the store so she was required to focus more on helping associates with tasks); *with* Ex. O, King Decl. ¶ 5 (would spend much of her time receiving deliveries and conducting cycle counts when she worked Shift 2 in Store 5101); *with* Ex. N, Gordon Decl. ¶ 4 (spent much of his day managing the product delivery intake while working Shift 2 at Store 8305; Shift 2 at Store 8305 did not involve a product delivery so he focused exclusively on managerial duties); *with* Ex. L, Gonzalez Decl. ¶ 15 (focused more heavily on directing associates to stock and organize shelves during Shift 2, while he focused on directing associates with regard to product delivery and cleaning on Shift 3); Ex. R, Swanson Decl. ¶ 8 (spent half of his time on exempt duties during evening shift, but non-exempt task work "dropped well below 50 percent of [his] time when [he] worked day shifts" because there were more associates staffed).

- ***The Size, Volume, and Type the Store***: *Compare* Ex. Q, Robey Decl. ¶ 4 (spent more time developing and managing the schedule in Store 960 and 369 than in other stores because of the number of associates in those stores); *with* Ex. N, Gordon Decl. ¶ 7 (as there were fewer employees at Store 398, a lower volume, non-fuel-store, he had to spend more time on task duties than at larger, fuel stores).

- ***Geographic Location of Store/Season***: *Compare* Ex. P, Pedano Decl. ¶ 11 (Store 957 was busier in the summer, requiring her to spend additional focus on hiring associates); *with* Ex. M, Goshey Decl. ¶ 11 (Store 909 was near Six Flags Great Adventure, so he had to spend more time on hiring and training new associates in anticipation of the summer months); *with* Ex. L, Gonzalez Decl. ¶ 5 (Stores 462 and 748 were near shore towns, so he spent more time training associates in winter months, while he spent more time on hiring and scheduling during the demanding summer months)

- ***Experience Level of Associates/Store Turnover***: *Compare* Ex. P, Pedano Decl. ¶ 12 (spent more time coaching associates in Store 957 because there was a constant stream of inexperienced associates due to high turnover); *with* Ex. L, Gonzalez Decl. ¶¶ 6, 9, 16 (the amount of time he spent on associate training and coaching depended on the number of associates working and the level of turnover); Ex. R, Swanson Decl. ¶ 10 (whether he delegated a task or took it on

himself depended on whether there was an associate working who was experienced).

- ***Experience in the AGM Role***: *See, e.g.,* Ex. Q, Robey Decl. ¶ 4 (level of discretion and independence increased as she became a more experienced AGM); Ex. O, King Decl. ¶¶ 7, 9 (did not play a large role in hiring or training and coaching associates as a new AGM, but those duties became a central component of her job after she gained experience); Ex. L, Gonzalez Decl. ¶¶ 3, 10 (became more comfortable exercising his discretion, particularly as it related to assisting in termination decisions, as he become more experienced in the AGM role).

- ***Previous experience and education of AGMs***; *Compare* Ex. O, King Decl. ¶ 13 (was consistently evaluating business needs and assessing appropriate staffing as an AGM given her prior experience as a restaurant manager); *with* Ex. L, Gonzalez Decl. ¶¶ 12-13 (his economics degree was particularly helpful in helping him to assess the stores' weekly and annual financial goals and advising the GM as to meet those goals).

- ***Various Miscellaneous Factors***: *Compare* Ex. N, Gordon Decl. ¶ 7) (more heavily focused on analyzing and managing inventory, sales figures, and product ordering at Store 398 than at other stores because Store 398 was closing for a remodel); *with* Ex. N, Gordon Decl. ¶ 8 (focused more on leading and training associates in Store 720 because there was a new, transitioning GM in the store); *with* Ex. L, Gonzalez Decl. ¶ 6 (spent more time mentoring and training at Stores 461 and 758 because they were training stores); *with* Ex. R, Swanson Decl. ¶ 5 (responsible for creating, implementing, and overseeing a training program for 40 associates in advance of opening a new store).

In sum, there is simply no uniformity among AGMs with respect to their duties that bear on their exempt status.  Rather, an individualized inquiry must be undertaken with respect to each and every AGM's day-to-day job duties.

III.    **ARGUMENT**

A.    **The First-Stage Certification Requirement, While More Lenient Than the Second-Stage, Still Requires Adequate Evidence That The Representative Plaintiffs Are "Similarly Situated" To the Individuals To Whom They Seek To Send Notice.**

The FLSA provides for the possibility of actions "by any one or more employees for and on behalf of himself or themselves and other employees similarly situated," 29 U.S.C. § 216(b), but a court need not certify every case, conditionally or otherwise, as a "collective action" and authorize notice.  *See Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 169 (1989) (holding that "district courts have **discretion, in appropriate cases,** to implement [§ 29 U.S.C. §] 216(b)") (emphasis added); *see also Symczyk v. Genesis Healthare Corp.*, 656 F.3d 189, 194 (3d Cir. 2011) ("'[T]he 'certification' we refer to here is only the district court's exercise of [its] discretionary power . . . to facilitate the sending of notice to potential class members,' and 'is neither necessary nor sufficient for the existence of a representative action under the FLSA.'") (citation omitted).  Indeed, certification at the notice stage is "not automatic," as Plaintiffs seem to suggest. *Evancho v. Sanofi-Aventis U.S., Inc.*, No. 07-2266, 2007 WL 4546100, at *2, (D.N.J. Dec. 19, 2007); *see also Smith v. Sovereign Bancorp, Inc.*, No. 03-2420, 2003 WL 22701017, at *3 (E.D. Pa. Nov. 13, 2003) (rejecting "automatic preliminary certification").

In deciding whether to certify an FLSA case as a collective action, courts generally follow a two-stage approach. *Symczyk*, 656 F.3d at 192. The first stage is not a mere formality. *See Harriel v. Wal-Mart Stores,* No. 11-2510, 2012 WL 2878078, at *4 (D.N.J. July 13, 2012) ("In spite of the modest evidentiary standard applicable at this stage, courts have not hesitated to deny conditional certification when evidence is lacking.") (citations omitted); *Kronick v. Bebe Stores, Inc.*, No. 07-4514, 2008 WL 4546368, *2 (D.N.J. Oct. 2, 2008) (same). "Under the 'modest factual showing' standard, "a plaintiff must produce some evidence, 'beyond pure speculation,' of a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected other employees." *Symcyzk*, 656 F.3d at 193. In other words, "[t]here must be a basis to conclude that questions common to a potential group of plaintiffs would predominate a determination of the merits in the case." *Evancho*, 2007 WL 4546100, at *2 (citation omitted); *see also Reed v. Empire Auto Parts, Inc.*, No. 13-5220, 2015 WL 761894, at *4 (D.N.J. Feb. 23, 2015) ("The underlying question is the extent to which the claims of the putative class can be proven through ***common evidence, versus individualized testimony***.") (emphasis added) (citation omitted).

Contrary to Plaintiffs' assertions, the Court must evaluate Defendant's evidence presented in opposition to conditional certification.[25]  As Plaintiffs acknowledge in their Motion, the Parties agreed to – and this Court ordered – a three-month schedule that was dedicated solely to discovery relating to the propriety of conditional certification.  *See* Pls.' Mem. at 3; *see also* Proposed Joint Discovery Order (Dkt. 18).  Failure to consider the evidence that Defendant developed during that discovery period would undermine the very purpose of this Court's Order.  *See In re Morgan Stanley Smith Barney LLC Wage and Hour Litig.*, No. 11-3121, 2016 WL 1407743, at *8 (D.N.J. Apr. 11, 2016) ("Plaintiffs cannot avoid that record" developed during discovery"); *Reed*, 2015 WL 761894, at *3 ("At the step-one inquiry, the Court does not weigh the evidence, resolve factual disputes, or reach the merits of Plaintiff's claims . . . [t]he Court does not, however, review Plaintiff's evidence in a vacuum.  ***It reviews Plaintiff's evidence***

---

[25] In addition to the record developed during the three-month discovery period, this Court should also consider Defendant's declarations submitted herewith.  *See, e.g.*, *Sloane v. Gulf Interstate Field Servs., Inc*., No. 16-01571, 2017 WL 1105236, at *8 (M.D. Pa. Mar. 24, 2017) (finding it "appropriate to consider evidence such as declarations presented by the defendants" because "[once] the parties have conducted extensive discovery, it is appropriate to carefully consider the submissions of the parties with respect to the collective action allegations") (citation omitted); *Harriel,* 2012 WL 2878078, at *5 (considering defendant's declarations for conditional certification and finding that they corroborated defendant's "assessment of the position"); *Bramble*, 2011 WL 1389510, at *2 (considering the declarations submitted by defendant for conditional certification and finding that they confirmed plaintiffs were not similarly situated to others); *Evancho*, 2007 WL 4546100, at 2-3 (same).

25

*in light of the evidence submitted by Defendants.*") (emphasis added) (citation omitted); *Bramble v. Wal-Mart Stores, Inc*., No. 09-4932, 2011 WL 1389510, at *5 n.6 (E.D. Pa. 2011) ("[R]ather than merely rely on the evidence presented by the Plaintiffs, it is appropriate to examine *all* the relevant evidence.") (emphasis added) (citation omitted); *Babin v. Stantec, Inc*., No. 09-1160, 2012 WL 2010 WL 3363920, at *4 (E.D. Pa. Aug. 25, 2010) (holding plaintiff failed to make a modest factual showing where defendant's evidence demonstrated individual differences). This is particularly true here given that Plaintiffs elected to pursue discovery and to rely upon the results of that discovery in their motion for conditional certification.

Where, as here, the party opposing conditional certification presents discovery and other evidence refuting or undermining the plaintiffs' theory for certification, courts conduct a more thorough examination of conditional certification. *See, e.g*., *Sloan*, 2017 WL 1105236, at *8 (noting that the Court must apply a "more searching standard in cases where substantial discovery has already changed hands"); *Harriel,* 2012 WL 2878072, at *4 (denying plaintiffs' motion for conditional certification in light of the "substantial discovery" conducted); *Babin*, 2010 WL 3363920, at *4 (same).  As set forth below, the cumulative evidence is clear that Plaintiffs fail to meet their burden for conditional certification and notice.

**B.   The Court Should Consider The Actual Job Duties Performed By the Plaintiffs and Other AGMs And, If Sufficient Variation Is Shown, Deny Conditional Certification.**

The decision to grant conditional certification of an FLSA action should be true to the purpose of the collective action – to facilitate the "efficient resolution . . . [of] common issues of law and fact." *Hoffman-LaRoche, Inc*, 493 U.S. at 170. If the merits of the case cannot ultimately be decided based on common evidence, a collective action offers no judicial efficiency.

In making the conditional certification determination, Defendant agrees that the Court need not reach a decision on the underlying merits of whether any given AGM met the executive exemption.  However, in a misclassification case like this one, the "similarly situated" question "must be analyzed in terms of the nature of the job duties performed by each class member, as the ultimate issue to be determined is whether each employee was properly classified as exempt." *Morisky v. Pub. Serv. & Gas*, 111 F.Supp.2d 493, 498 (D.N.J. Aug. 15, 2000).[26]

---

[26] *See also King v. West Corp*., No. 04-318, 2006 WL 118577, at *14 (D. Neb., Jan 13, 2016) ("deciding whether members of this proposed class are 'similarly situated' requires analyzing the nature of the job duties performed by each putative plaintiff.") (citations omitted); *Bramble,* 2011 WL 1389510, at *5, n.6 ("[Because] the issues [in this case] revolve around whether the day-to-day tasks of [Store Managers and Assistant Managers] are consistent with their designation as exempt," this court "must necessarily examine evidence of the job duties actually performed" by all the Store Managers and Assistant Managers.) (citation omitted); *Evancho,* 2007 WL 4546100, at *304 ("While the Court need not reach the merits of these exemption argument[s] at this point, these differences between various [putative collective action members'] descriptions of their job responsibilities and

27

Thus, it is not enough for Plaintiffs to merely allege a common policy of exempt classification, as a determination of whether the exempt employees are entitled to overtime "depends on the individual, fact-specific analysis of each employee's job responsibilities under the relevant statutory exemption criteria." *Morisky*, 111 F.Supp.2d at 498.

Here, Defendant's primary defense at trial will be that that some or all AGMs meet the executive exemption under the FLSA.  Assessment of whether each AGM falls into the executive exemption necessarily requires a highly individual, fact-intensive inquiry into the day-to-day duties of each AGM given the test for exempt status.  An employee qualifies for the executive exemption when the employee "(1) has as his or her primary duty management of the enterprise in which the employee is employed []; (2) customarily and regularly directs the work of two or more other employees; (3) has the authority to hire and fire other employees or makes suggestions and recommendations as to hiring, firing, advancement, promotion or any other change of status of other employees that are given particular weight.  29 C.F.R. § 541.100(a).[27]

---

duties show that status under the FLSA may vary among plaintiffs and potential collective action members.").

[27] To meet the executive exemption, the employee must also be compensated on a salary basis at a rate not less than $455 per week (29 U.S.C. § 213(a)(1)), which is not in dispute here.

The FLSA regulations further provide a lengthy, non-exhaustive list of managerial activities to consider when analyzing whether an employee's primary duty is "management" within the meaning of the statute.[28]  Every one of those 14 categories of exempt work must be analyzed for each AGM.  Further, determination of an employee's "primary duty" requires a fact-based investigation into the day-to-day activities of an individual, taking into account the "relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision."  29 C.F.R. § 541.700(a).  Based on this multi-faceted test, there can be no dispute that determining the applicability of the executive exemption requires an individualized analysis of the employee's daily duties.

This is precisely why Courts routinely deny conditional certification in cases involving individual factual inquiries associated with exemption defenses.  *See,*

---

[28] "Management" duties include, but are not limited to, (1) interviewing, selecting, and training of employees; (2) setting and adjusting employees' rates of pay and hours of work; (3) directing employees' work; (4) maintaining production or sales records for use in supervision or control; (5) appraising employees' productivity and efficiency for purposes of recommending promotions or other change in status; (6) handling employee complaints and grievances; (7) disciplining employees; (8) planning the work; (9) determining the techniques to be used; (10) apportioning the work among the employees; (11) determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold, controlling the flow and distribution of materials or merchandise and supplies; (12) providing for the safety and security of the employees or the property; (13) planning and controlling the budget; and (14) monitoring or implementing legal compliance measures.  29 C.F.R. § 541.102.

29

*e.g., Sloane*, 2017 WL 1105236, at *13 (denying conditional certification because resolution of exemption defenses, including the ***executive exemption***, "will require significant individualized fact-finding"); *Harriel*, 2012 W 2878078, at *5 n.3 (denying conditional certification in an ***executive exemption*** case because "the court would have to inquire 'as to the daily tasks of each putative collective action member to determine whether they are similarly situated") (citation omitted).  The same result is appropriate here given the highly varied duties among AGMs, *see supra* at 14-15, which compel an individualized merits analysis at trial for each AGM.

### C. Conditional Certification Should Be Denied Because Plaintiffs Have Not Shown That They Are Similarly Situated To Hundreds Of Other AGMs They Seek To Represent.

#### 1. Plaintiffs Point To No Policies Causing Common Alleged Misclassification, Including The Job Description and Training That They Claim Have No Bearing On Their Jobs.

Plaintiffs have failed to make even a "modest factual showing" that they are similarly situated to other AGMs.  As a preliminary matter, Plaintiffs' extensive focus on Wawa's common classification of AGMs as exempt is a red herring.  Pls' Mem. at 5-6, 12, 18.  It is well-accepted that the mere common classification of all AGMs is insufficient to meet Plaintiffs' burden.  *See, e.g., Essex v. Children's Place, Inc*., No. 15-5621, 2016 WL 4435675, at *6 (D.N.J. Aug. 16, 2017) ("[T]he mere classification of a group of employees—even a large or nationwide group—

as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all putative class members as 'similarly situated' for purposes of §216(b) purpose.") (citation omitted).[29]

    Plaintiffs' reliance on the Job Description and training materials is also insufficient.  As explained *supra* at 2-4, the Job Description is merely a tool for evaluating disability accommodations and specifically confirms that AGMs' duties vary from person to person.[30]  Most importantly, the Job Description is of no utility in determining whether AGMs are similarly situated because Plaintiffs ***uniformly deny*** that the Job Description describes their day-to-day duties.[31]  *See supra* at 7-9.

---

[29] *See also Bramble*, 2011 WL 1389510, at *4 (uniform classification is insufficient to establish that all individuals holding the position are similarly situated); *Bamgbose v. Delta-T Grp. Inc.*, 684 F. Supp. 2d 660, 668-69 (E.D. Pa. 2010 (denying conditional certification and holding "[t]he Court cannot only look to [defendant's] uniform classification of the workers . . . . Instead, it must determine whether the proof . . . can be applied to the class as a whole."); *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 221 (D. Conn. July 15, 2003) (holding that decision to reclassify position as non-exempt "does not provide the necessary common thread" to render plaintiffs similarly situated to others).

[30] Use of a common job description is alone insufficient to support conditional certification anyway.  *See, e.g.*, *Costello v. Kohl's Ill. Inc.*, No. 13-1359, 2014 WL 4377931, at *1 ("[I]f a uniform job description by itself was sufficient, every business in corporate America would be subject to automatic certification of a nationwide collective action on the basis of personal experiences of a single misclassified employee.").

[31] Plaintiffs' reliance on *Ruffin v. Avis Budget Car Rental*, L.L.C., No. 11-01069, 2012 WL 2514841 (D.N.J. June 28, 2012) is misplaced.  Plaintiffs in that case alleged that they performed consistent with the job description.  Pls' Mem. at 19.

*See Harriel*, 2012 WL 2878078, at *5 (denying conditional certification and explaining that the plaintiffs' reliance on the common description was misplaced given his allegation that he performed his job contrary to the description, so "the Court [need not] infer that other OAMs would have also deviated from the written job description"); *see also Brown v. Barnes & Noble, Inc*., 252 F. Supp. 3d 255, 263 (S.D.N.Y. 2017) (denying conditional certification, as "[i]t is not enough for Plaintiffs to point to the job description as evidence that all CMs perform similar duties when, under Plaintiffs' own theory of the case, the job description did not accurately reflect the duties they personally performed").  Where plaintiffs testify to duties specifically inconsistent with a job description, the description become evidence ***against*** conditional certification.  *See, e.g.*, *Guillen v. Marshalls of MA, Inc.*, 750 F. Supp. 2d 469, 477 (S.D.N.Y. 2010) ("[T]he fact that ASMs were responsible for performing non-exempt tasks in contravention of their written job description requirements in nine stores . . . out of 820 stores nationwide, provides little basis to believe that [plaintiff] is similarly situated to ASMs"); *Bramble*, 2011 WL 1389510, at *5 (denying conditional certification, as "[p]laintiffs do not point to a job description that says that APCs are required to perform non-exempt tasks for a majority" of hours, but instead argue "that as a matter of fact, rather than

offormal job description, they are performing non-[exempt] duties for the majority of their working hours") (citation omitted).[32]

    The training is equally unhelpful to establishing uniformity among AGMs' duties.  As demonstrated supra at 4, AGM Learning Map was not applicable to nearly every Plaintiff and Opt-In Plaintiff or to 69% of other AGMs.  Perhaps more important, Plaintiffs claimed that they did not use the majority of training that they received regarding management functions, so the training did not reflect how they performed their jobs.  *See supra* at 13-14.  And AGMs receive widely training based on many factors, including their previous experience, whether they were hired internally or externally, and the preferences of their GMs.  *See supra* at 11-14.

    Plaintiffs fare no better by attempting to rely on Wawa's so-called "corporate policies".  Pls' Mem. at 10-11.  Plaintiffs disregard the testimony of Wawa's corporate deponent, which confirms that the "Hourly 'Eye of the Customer' Guidelines" and the B.E.S.T. Forms are non-binding and ***may not even***

---

[32] *See also Mike*, 274 F. Supp. 2d at 221 (denying conditional certification where plaintiff disavowed the job description, as plaintiff's claim will "turn upon evidence relating to [plaintiff's] day-to-day tasks, and not upon [defendant's] policy or decision.").  *C.f. Adeel Tahir, et al. v. Avis Budget Group, Inc.*, No. 09-3495, 2011 WL 1327861, at *3 (D.N.J. Apr. 6, 2011) ("Plaintiff's reliance on the common documents misses the point of the claim . . . Indeed, the job description . . . . contains many managerial tasks.  It sheds no light on how [p]laintiff and others were similarly subjected to an improper compensation practice by [defendants] based on the true nature of their work.").

*be used* by AGMs depending upon, among other things, the varying preferences of the GMs in each of the more than 750 Wawa stores.  *See supra* at 6-7.  These forms, moreover, do not relate specifically to AGMs; they contain tasks that can be delegated in varying ways to any number of employees in different positions in the store.  *See supra* at 6-7.  Indeed, AGMs who submitted declarations confirming that they delegate those tasks rather than performing them.  *See supra* at 20-22.

For this reason, nothing within the forms actually limits the discretion of AGMs in carrying out their job duties.  To the contrary, as Plaintiffs concede, the "Hourly 'Eye of the Customer' Guidelines" specifically provides that the manager should "*plan/delegate [to] others*" or "*complete*."  Pls' Mem. at 10.  Thus, an AGM could choose whether to complete the task or delegate it to another associate.  In sum, neither the "Hourly 'Eye of the Customer' Guidelines" nor the B.E.S.T. Form supports the claim that hundreds of AGMs are similarly situated to one another.  *See, e.g*, *Ahmed, et al. v. TJ Maxx Corp. et al.*, 103 F. Supp. 3d 343, 356 (E.D.N.Y. 2015) (denying conditional certification and noting the corporate policies on which plaintiffs rely did not limit the discretion of employees in performing their duties).

The remaining alleged policies Plaintiffs cite – namely, the Corporate Policy Manuel and Employee Handbook – have no nexus to Plaintiffs' claim that Wawa improperly classified them as exempt because they have nothing to do with duties.

Pls' Mem. at 11-12 (noting the policies relate to the associates' discount, paid time off, store decoration, and retirement plan).  *See Brown*, 2017 WL 1653576, at *8 (reliance on "uniform" policies regarding price for café goods or preparation of food/beverages are irrelevant for conditional certification purposes because they had no bearing on whether plaintiffs were improperly classified as exempt).

> ### 2.   The Overwhelming Evidence, Including Plaintiffs' Own Testimony, Shows AGMs Are Not Similarly Situated.

The testimony of Wawa's corporate representatives, AGM declarations showing the varying management duties of AGMs, and the testimony from Plaintiffs themselves all show that whether any particular AGM is correctly classified as exempt necessarily requires an individualized determination.  *See supra* at 2-5, 14-15.[33]  Where, as here, the evidence presented demonstrates that

---

[33] That Plaintiffs' claimed experiences do not mirror those of other AGMs is reinforced by the fact that ten individuals among more than 1,550 AGMs have elected to join the action in more than ten months.  *See, e.g.*, *Hughes v. Township of Franklin*, No. 13-3761, 2014 WL 1428609, at * 3 (D.N.J. Apr. 14, 2014) ( "limited number" of opt-ins weighed against conditional certification); *Goldstein v. Children's Hosp. of Phila.*, No. 10-01190, 2012 WL 5250385, at *5 (E.D. Pa. Oct. 24, 2012) (same); *Wright v. Lehigh Valley Hosp.,* No. 10-431, 2010 WL 3363992, at *4 (E.D. Pa. Aug. 24, 2010) (same).  AGMs' lack of interest in joining this case is particularly revealing given Plaintiffs' counsel's solicitation campaign to recruit potential plaintiffs dating back to as early as April 2016.  *See, e.g.,* Ex. B, Gervasio Dep. at 19:13-23.  Notwithstanding that Plaintiffs' counsel appears to have sent a form solicitation letter to potential plaintiffs, which clearly stakes out their position that AGMs "could be owed money" because they allegedly "spent a majority of [their] time performing non-managerial tasks," only ten people have joined this case (Dkt. 40).

there is wide variation in AGMs' duties and the time devoted to each, certification should be denied because individualized inquiries as to the applicability of the executive exemption would undoubtedly overwhelm collective resolution.

To illustrate, as described above, this Court must evaluate for each and every AGM not only whether he or she performed managerial functions (*e.g.*, hiring, firing, managing performance of associates, and delegating work), but also whether managerial work was their "primary duty" taking into account the amount of time that each individual devoted to managerial work, the level of discretion they were given, and the importance of these duties in comparison to other non-management work they may have performed. *See supra* at 14-15, 20-11.  Plaintiffs' own testimony and the sworn declarations of other AGMs confirm that each of these factors vary considerably for each AGM depending on many factors. *See supra* at 14-15, 20-22.  And when an individualized inquiry is conducted, Plaintiffs may argue that an AGM like Plaintiff Dinse fell outside the executive exemption because he totally failed to act as a manager by coaching, training, and managing associates as noted in his final performance evaluation before his termination. *See supra* at 17 n.3.  But an AGM such as Katrina Pedano, by comparison, spent 60% of her time performing management functions such as hiring associates, managing their performance, and overseeing training and development. *See* Ex. P, Pedano Decl. ¶ 10.  This type of individualized assessment is precisely why courts are

hesitant to conditionally certify cases involving FLSA exemptions. *See, e.g.*, *In re Morgan Stanley Smith Barney*, 2016 WL 1407743, at *5 (denying conditional certification and noting that "[u]nsurprisingly, determining whether an employee is exempt involves a fact intensive inquiry"); *Tahir*, 2011 WL 1327861, at *4 (denying conditional certification in executive exemption case and explaining that plaintiff "must demonstrate that others were performing the same or at least substantially similar duties as he was . . . [o]therwise, providing liability for the alleged FLSA violation devolves into a mini-trial for each class member, requiring an individualized examination of each employee's duties according to the multi-factorial tests of what properly constitutes work in a bona fide executive [] capacity"); *Bramble*, 2011 WL 1389510, at *8 (denying conditional certification because despite the same job title and description, the exemption analysis would require an individualized inquiry, so "[l]itigating this case as a collective action would be anything but efficient"); *Evancho*, 2007 WL 4546100, *6 (denying conditional certification due to differences among various individuals' descriptions of their job responsibilities). This case is equally unsuitable for collective adjudication.

## IV.   NOTICE, IF ANY, SHOULD BE LIMITED TO LOCATIONS WHERE PLAINTIFFS WORKED.

As discussed above, there is no common evidence relating to the experiences of Plaintiffs and the putative collective action members. Rather, Plaintiffs offered

evidence of their own experiences in a handful of stores and had no meaningful

information regarding the experiences of AGMs at other stores.  *See supra* at 9-11.

Therefore, if the court grants conditional certification at all, which it should not,

Wawa respectively submits that it should at minimum limit certification and notice

to the stores at which Plaintiffs worked during the maximum three-year limitation

period.  *See, e.g.*, *Hodzic v. Fedex Package Sys., Inc.*, No. CV 15-956, 2016 WL

6248078, at *9 (W.D. Pa. Oct. 26, 2016) (limiting the notice to those who worked

in the same location as plaintiffs so that "the scope of the putative class [would]

conform to the evidence that has been presented by Plaintiffs"); *Naicker v. Warrior*

*Energy Servs., Inc.*, No. 2:14-CV-01140, 2015 WL 1642209, at *5 (W.D. Pa. Apr.

9, 2015) (same); *Dunkel v. Warrior Energy Servs., Inc.*, 304 F.R.D. 193 (W.D. Pa.

2014).

## V.     ANY NOTICE ALLOWED SHOULD BE FAIR AND ACCURATE.

If any collective action is certified, which it should not be, Plaintiffs should

confer with Defendant to develop an appropriate notice for the Court's review.  *See*

*Atis v. Freedom Mortg. Corp.*, No. 15-3424, 2016 WL 7440465, at *5 (D.N.J. Dec.

27, 2016) (ordering the parties to meet and confer and submit a revised notice for

the court's approval).  Among other concerns with the Plaintiffs' proposed Notice:

- It seeks authorization to send notice to all AGMs employed since January
  12, 2014, rather than those employed two- or three- years from the date of
  the order conditionally certifying the collective action;

- It does not sufficiently describe Defendant's defenses, critical to an "accurate and informative" notice;[34]

- It seeks to distribute notice through "unnecessary and redundant" means such as regular mail, email, and postings at Wawa stores and on paychecks.[35]

Moreover, Plaintiffs' broad request for personal AGM information should be denied because Wawa is willing to pay for a third-party claims administer to distribute the notice. The expertise of such an administrator in locating putative collective action members who have moved, for instance, can only benefit Plaintiffs. Providing contact information to Plaintiffs' counsel instead would jeopardize the integrity of the Court-supervised notice process because counsel could then direct misleading and/or coercive communications to AGMs beyond the approved notice.

## VI.   CONCLUSION

Given the variation in duties described above, it would be impossible to collectively litigate whether 1,550 AGMs meet the executive exemption, which turns on individualized evidence. This Court should deny Plaintiffs' Motion.

---

[34] *See, e.g., Bailey v. Youth Vills, Inc*., No. 07-1089, 2008 WL 2987201, at *2 (W.D. Tenn. July 30, 2008) (notice should include "more detail" regarding denial of liability).

[35] *Aboud v. City of Wildwood*, No. 12-7195, 2013 WL 2156248, at *8 (D.N.J. May 17, 2013); *see also Boyington v. Percheron Field Servs., LLC*, No. 14-90, 2015 WL 3756330, at *3 (W.D. Pa. June 16, 2015) (notice by both mail and email "overly intrusive").

November 1, 2017                          MORGAN, LEWIS & BOCKIUS LLP

                                          By: */s/* Keri L. Engelman
                                              Keri L. Engelman (NJ ID # 043742011)
                                              Michael J. Puma (*pro hac vice*)
                                              Chloe K. Leigh (NJ ID # 194082016)
                                              1701 Market Street
                                              Philadelphia, PA  19103
                                              Telephone: 215.963.5000
                                              Facsimile: 215.963.5001

                                              *Attorneys for Defendant Wawa Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of Defendant Wawa, Inc.'s Opposition to

Plaintiffs' Motion for Conditional Certification was served on this 1st day of

November 2017, upon the following counsel of record via ECF:

Joseph D. Monaco, III, Esq.
The Law Offices of Joseph Monaco, P.C.
Seven Penn Plaza Suite 1606
New York, New York 10001
Telephone: 212-486-4244
Facsimile: 646-807-4749

Charles Gershbaum, Esq.
Marc S. Hepworth, Esq.
David A. Roth, Esq.
Rebecca S. Predovan, Esq.
Hepworth, Gershbaum & Roth, PLLC
192 Lexington Avenue, Suite 802
New York, New York 10016
Telephone: 212-545-1199
Facsimile: 212-532-3801

*Attorneys for Plaintiffs*

*s/ Keri L. Engelman*
Keri L. Engelman